IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BETTY SCALLY, Independent Executor of the Estate of John Scally, deceased, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | No. 03-cv-4208-JPG |
| VETERANS ADMINISTRATION and UNITED STATES OF AMERICA, ) ) ) | |
| Defendants. ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**GILBERT, District Judge:**

This case was tried to the Court on December 5-6, 2005. At the conclusion of the evidence and arguments, the Court ruled against the plaintiff, Betty Scally, independent executor of the estate of John Scally, deceased, and in favor of the defendants, Veterans Administration and United States of America.

**I. FINDINGS OF FACT**

1. The Veterans Administration Medical Center ("VAMC") in Marion, Illinois, an agency of the United States of America, employed Dr. Vandu Nagpal, Dr. Varadendra Panchuamuhki and Roxanne White, R.N., and in the instant case, they are agents of the United States.

2. Dr. B. Theo Mellion, at all times relevant to this action, was a neurosurgeon in private practice, and performed surgery predominately at Memorial Hospital of Carbondale.

3. Dr. Mellion treated VAMC patients on a contract for services fee arrangement, but neither Dr. Mellion nor the Memorial Hospital of Carbondale was otherwise affiliated with VAMC or the United States.

4. John Scally, age 62 and now deceased, was a patient at the VAMC and had a medical history of coronary artery disease, hypertension, diabetes, hypercholesterolemia, degenerative osteoarthritis, chronic renal insufficiency, gynecomastia and obesity.

5. Mr. Scally injured his back in the mid-1950s while serving his country in the United States Marine Corps.

6. Mr. Scally underwent lower back surgery in the late 1960s or early 1970's for a herniated disk, but due to progressive osteoarthritis, suffered from lower back pain for 20 to 30 years prior to his death .

7. From the mid 1990's on, Mr. Scally's back pain had gotten progressively worse, becoming so severe that Mr. Scally was able to walk only 20 to 30 feet prior to resting, could not retrieve mail from his mail box, and could not hunt and fish with his grandchildren anymore.

8. As early as 1998, Mr. Scally's back problems were so severe that Gary Miller, M.D., a VAMC employee, presented Mr. Scally's case to the Spine Conference at the John Cochran Veterans Administration Medical Center, St. Louis, Missouri, a routinely held conference involving numerous orthopedic surgeons. Following the presentation, a determination was made that Mr. Scally would benefit from surgical intervention.

9. Mr. Scally sought help from Dr. Mellion and wanted back surgery if it would alleviate his pain and give him some ability to better enjoy life. On January 19, 2001, Dr. Mellion saw Mr. Scally at the pain clinic at VAMC and advised Mr. Scally that he was a likely candidate for surgery.

10. Dr. Mellion testified that, notwithstanding the attendant risks, in situations where patients suffer from severe back pain and conservative intervention has not helped, a usual response is for them is to say "I can't live with this, I've got to take the chance, I've got to do something."

11. Dr. Mellion's examination of Mr. Scally showed that Mr. Scally suffered from degenerative disk disease and foraminal stenosis with severe mechanical lower back pain as well as intermittent left-sided radicular pain.

12. Dr. Mellion told Mr. Scally that his symptoms might be either helped or worsened by surgery.

13. Dr. Mellion testified, and the Court finds, that Mr. Scally was "a guy that was really quite miserable and wanted to consider having something done."

14. Dr. Mellion testified, and the Court finds, that he met with both Mr. and Mrs. Scally and informed them at length about the risks which surgery carried. See paragraph 49 of this order regarding the credibility determinations with respect to this meeting with Dr. Mellion.

15. Dr. Mellion provided Mr. and Mrs. Scally with the first of two consent forms detailing the risks of surgery.

16. Dr. Mellion advised Mr. Scally that he was at moderately high risk for surgery.

17. Dr. Mellion did a risk-benefit analysis of the surgery with Mr. and Mrs. Scally and left the decision about undergoing the contemplated back surgery with Scally.

18. Prior to surgery, because of Mr. Scally's other medical problems including, *inter alia*, coronary artery disease, Dr. Mellion requested that a stress test be performed and requested a risk assessment that Dr. Mellion referred to as a medical "clearance" from Mr. Scally's primary care physician.

19. Dr. Mellion referred Mr. Scally to Dr. Nagpal, his primary care physician, who did the pre-surgery assessment.

20. Dr. Nagpal testified, and the Court finds, that a preoperative "clearance" is a misnomer

in that the word "clearance" means "risk assessment" for a proposed surgery and does not mean that she, or anyone else involved in the risk assessment, would actually clear anyone for surgery.

21. Mr. Scally suffered from a multitude of physical ailments, including coronary artery disease, heart disease, obesity, controlled hypertension, high cholesterol, diabetes, anemia, degenerative osteoarthritis, chronic renal insufficiency and gynocomastia. Mr. Scally's heart disease alone put him at moderate risk for surgery. Mr. Scally's diabetes alone would also put him at increased risk.

22. Mr. Scally's cardiologist at VAMC was Dr. Panchuamuhki who in December, 1999 ordered a stress test be performed on Mr. Scally because he was complaining of some chest pain even though Dr. Panchuamuhki thought the chest pains were atypical for angina.

23. The December 1999 stress test was positive and revealed a small reversible inferior wall ischemia.

24. Dr. Panchuamuhki performed a heart catheterization in February, 2000 which revealed that the cause of the ischemia was a forty percent blockage of the left circumflex artery which was in an area too small to clear by invasive procedures and was considered non-critical and to be treated with drugs.

25. Dr. Panchuamuhki and the governments expert cardiologist, Dr. Randolph S. Martin, both testified, and the Court finds, that this small blockage in a non-critical artery had no bearing on the subsequent death of Mr. Scally.

26. The stress test ordered by Dr. Mellion was performed on February 8, 2001, at VAMC and showed the same defect with no significant change.

27. During the risk evaluation, Dr. Nagpal consulted with Dr. Panchuamuhki regarding the

risk that Mr. Scally's coronary artery disease posed for the orthopedic surgery that Mr. Scally was to undergo.

28. Dr. Panchuamuhki reviewed the first and second stress tests and the catheterization results and concluded that the blockage remained the same and that no further testing or procedure was necessary.

29. Dr. Panchuamuhki verbally consulted with Dr. Nagpal and opined that Mr. Scally's heart condition presented a moderate increased risk for the orthopedic procedure proposed.

30. Dr. Panchuamuhki told Dr. Nagpal that Mr. Scally would need very close cardiac monitoring during surgery, cardiac enzymes tested post-operatively, and careful management of fluids, during and after surgery.

31. Dr. Nagpal communicated the risk assessment to Dr. Mellion.

32. Dr. Nagpal testified, and the Court finds, that although she did not have an independent recollection of explaining the increased risks to Mr. Scally, her standard operating procedure was invariably to explain the risks to every patient for whom she had performed a risk assessment and if the putative patient were at increased risk she would explain in percentages the risks involved.

33. Dr Nagpal testified that she was absolutely sure, and the Court finds, that she explained the increased risk to Mr. Scally including the fact that he would have a one to five percent chance for a cardiac event including death.  See paragraph 49 of this order regarding the credibility determinations with respect to this meeting with Dr. Nagpal.

34. Nurse Roxanne White also explained the risks to Mr. Scally noting that she remembered telling Mr. Scally that most people who elected to have the back surgery that he was about to have were at low risk and that he, Mr. Scally, was at moderate risk.  Mr. Scally said he understood this

and still wanted the surgery. See paragraph 49 of this order regarding the credibility determinations with respect to this meeting with nurse White.

35. On March 8, 2001, Dr. Mellion again explained the risks to Mr. Scally and told him he was at moderate to high risk. See paragraph 49 of this order regarding the credibility determinations with respect to this meeting with Dr. Mellion.

36. For the second time, on March 8, 2001, Mr. Scally signed an informed consent which explained the risks.

37. The surgery was successfully performed by Dr. Mellion on March 8, 2001, without complications or any indication of any heart problems.

38. After the surgery, however something went terribly wrong in the hours following the surgery, and Mr. Scally died.

39. The medical records suggest that perhaps during or after surgery too much fluid was given to Mr. Scally resulting in his death. But, the Court finds that there is not enough evidence to conclude by a preponderance of the evidence whether excess fluids caused Mr. Scally's death or whether Mr. Scally was just one of the unlikely one in five risk candidates where there is no explanation.

40. The Plaintiff, Betty Scally, is the duly appointed independent executor of the estate of John Scally, her deceased husband.

41. The plaintiff timely filed a claim for wrongful death with the administrative agency, and said claim was denied.

42. Before the Court makes further findings of fact regarding matters in dispute, the Court first addresses the issue of exactly who plaintiff alleges to have breached the standard of care in the

instant action. During the testimony of plaintiff's expert, Dr. Joseph Klapper, Dr. Klapper clearly testified that the only doctor at VAMC who breached a duty to provide appropriate care was Dr. Panchuamuhki. Dr. Klapper testified that he found no fault with the appropriateness of the risk assessment as it pertained to Dr. Nagpal. Even though plaintiff filed an amended complaint at the close of the evidence "so as to allow the allegations of negligence in said pleading to conform to the testimony and opinions of Dr. Klapper" (Doc. 43), the amended complaint still names both Dr. Nagpal and Dr. Panchuamuhki as the VAMC doctors who were negligent. But at the close of the evidence, government's counsel asked the Court to recognize that plaintiff was only alleging negligence on the part of Dr. Panchuamuhki, and plaintiff's counsel agreed that this was in fact the case and final argument then proceeded accordingly. Based upon these facts, the Court finds that plaintiff stipulated that only Dr. Panchuamuhki's actions are at issue. However, the Court will also consider Dr. Nagpal's care as set forth below.

43. Both Dr. Martin and Dr. Klapper testified that the American College of Cardiology/American Heart Association Guideline Update on Perioperative Cardiovascular Evaluation for Noncardiac Surgery (ACC/AHA) are authoritative and specifically set out the guidelines to be followed when a cardiologist performs a risk assessment from a cardiology point of view for a patient about to undergo noncardiac surgery as was the case with Mr. Scally who was about to undergo an orthopaedic procedure. Although this finding could be designated as an undisputed fact, the Court finds that the ACC/AHA guidelines are guidelines to be followed when Dr. Panchuamuhki assessed Mr. Scally's risk from a cardiology perspective.

44. The ACC/AHA guidelines set out a two step process for the risk assessment Dr. Panchuamuhki performed. First, a patient's medical condition is assessed and the patient is assessed

as either at minor, intermediate (moderate) or major (high) risk for a heart problem during or after surgery which could lead to serious problems including death. Second, the type of surgery contemplated is assessed as low, intermediate, or high risk. Orthopedic surgery is classified as intermediate risk surgery. Both Dr. Martin and Dr. Klapper testified that strictly adhering to the guidelines placed Mr. Scally in the intermediate risk category. Although Dr. Klapper from time to time referred to Mr. Scally's risk as "moderate to high" or " moderately high," the Court finds Dr. Martin's testimony more persuasive and finds that Mr. Scally's risk category for the surgery performed by Dr. Mellion was intermediate or moderate (Dr. Klapper had changed his testimony from an opinion of extremely high risk to moderate to high when the ACC/AHA guidelines were considered). Mr. Scally's co-morbidities, taken together according to the ACC/AHA guidelines, resulted in Mr. Scally individually being classified as moderate risk for surgery. The surgery was considered a moderate risk procedure. The result is a moderate at risk patient undergoing a moderate risk procedure.

  45. Dr. Klapper opined that Dr. Panchuamuhki's assessment of Mr. Scally's risk deviated from the standard because he did not see the patient prior to surgery and did not personally see, question or examine Mr. Scally prior to the surgery. Dr. Martin testified that the standard of care did not require Dr. Panchuamuhki, who was familiar with the patient, to personally see, question or examine Mr. Scally prior to assessing his risk because he was familiar with Mr. Scally's cardiac problems and reviewed and evaluated the second stress test which was ordered by Dr. Mellion. The Court finds Dr. Martin's testimony more persuasive and finds that Dr. Panchuamuhki did not have to personally see, question and examine Mr. Scally in order to meet the standard of care required.

46. Dr. Klapper testified Dr. Panchuamuhki didn't properly review the differences in the first and second stress test nor incorporate Mr. Scally's chest pains into his risk assessment. Dr. Martin testified that the first and second stress tests were both positive but essentially the same and no further testing was needed. Drs. Panchuamuhki, Nagpal and Martin all testified that if the chest pains Mr. Scally had were actually due to the blockage found in the minor artery, Mr. Scally still would have been property classified at moderate or intermediate risk. The Court finds as fact that Dr. Panchuamuhki did not breach the standard of care in his assessment of the stress tests and properly considered all of Mr. Scally's cardiac symptoms.

47. Dr. Klapper testified that Dr. Panchuamuhki failed to communicate the true risk to Dr. Mellion and that he breached the appropriate standard of care by providing Dr. Nagpal with a verbal rather than written assessment. Dr. Martin testified that the standard of care did not require Dr. Panchuamuhki to directly communicate with Dr. Mellion or provide a written report to Dr. Nagpal. The Court finds that Dr. Panchuamuhki did not deviate from the appropriate standard of care when he provided a verbal assessment to Dr. Nagpal and he had no duty to personally communicate with Dr. Mellion.

48. The Court finds that the increased risk for surgery was properly communicated to Mr. Scally. Dr. Klapper testified that he assumed that neither Dr. Panchuamuhki nor anyone else communicated the risk assessment to Mr. Scally. The evidence is to the contrary. Dr. Nagpal testified that she communicated the risk to Mr. Scally as did nurse Roxanne White. The Court finds by a preponderance of the evidence that the increased risk was communicated to Mr. Scally and Dr. Mellion reiterated the fact of increased risk to Mr. Scally on the day of the operation.

49. Betty Scally testified that she was with her husband each and every time he came to

VAMC and was present when the pending back surgery was discussed with Dr. Nagpal, nurse White, and Dr. Mellion at both VAMC and Memorial Hospital of Carbondale. Mrs. Scally testified that no one mentioned an increased risk for surgery. The Court finds this testimony curious because Mrs. Scally didn't remember ever seeing her husband sign any of the consent forms, for which there is documentary evidence, or hear either Dr. Nagpal or Dr. Mellion talk about any risks of surgery. Based upon Mrs. Scally's demeanor while testifying, questions about her memory of details and the treating health professionals' testimony contrary to her testimony, the Court finds the treating physicians' and nurse's testimony more credible on this issue. Therefore, this Court finds the risks were discussed with Mr. Scally and that either Mrs. Scally was not present at all times when the pending operation was discussed or simply does not remember the discussions about increased risk. The Court recognizes that one possible explanation for Ms. Scally not remembering any such discussion is that the death of Mr. Scally was a traumatic and tragic event that perhaps clouds Ms. Scally's memory.

## II. CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and the parties.

2. To prevail on this Federal Tort Claims Act case claiming negligence on the part of the above named medical doctors employed by the VAMC, plaintiff was required to prove by a preponderance of the evidence all of the elements of a medical malpractice action pursuant to the laws of the State of Illinois. 28 U.S.C.A. §§ 1346(b), 2671 through 2680 (1999); *Richards v. United States*, 369 U.S. 1 (1962); *Midwest Knitting Mills v. United States*, 950 F.2d 1295 (7th Cir. 1991); *Wyletal v. United States*, 907 F.2d 49 (7th Cir. 1990). Illinois law applies in this case.

3. In a negligence medical malpractice case, the burden is on the plaintiff to prove the

following elements of a cause of action: the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by a physician's want of skill or care. *Purtill v. Hess*, 489 N.E.2d 867, 872 (Ill. 1986). Plaintiff, by use of expert testimony, must establish the standards of care against which the defendant medical provider's conduct is measured. The plaintiff must present affirmative evidence to prove, in light of these standards, that the medical provider was unskillful or negligent, and that his want of skill was the proximate cause of injury to plaintiff. *Borowski v. Von Solbrig*, 328 N.E.2d 301, 305 (Ill. 1975); *Roach v. Springfield Clinic*, 585 N.E.2d 1070, 1080 (4th Dist. 1991).

4. Dr. Panchuamuhki owed a duty to Mr. Scally to provide appropriate and acceptable medical care to Mr. Scally.

5. Dr. Panchuamuhki did not breach his duty and did not breach a standard of care as it relates to his preoperative clearance or assessment at issue.

6. The Court finds that there was a formal consultation with Mr. Scally by Dr. Nagpal, his primary physician. The Court finds the expert testimony of Dr. Martin persuasive and the fact that Dr. Panchuamuhki did not personally consult with Mr. Scally was not necessary since Dr. Panchuamuhki's assessment was relayed to Mr. Scally through Dr. Nagpal. The fact that the consult was done verbally versus in writing does not breach any standard of care according to Dr. Martin and the Court agrees.

7. The risk assessment of Dr. Panchuamuhki was conveyed from Dr. Panchuamuhki to Dr. Nagpal and then to Dr. Mellion. Everything Dr. Panchuamuhki did in performing his assessment, including reviewing of the second stress test, comparing the results, conferring with Dr.

Nagpal, assessing that Mr. Scally was at moderate risk because of his heart problem and further recommending close monitoring of the heart, heart enzymes, and fluids, met the standard of care.

8. Even though the Court finds that there was no breach of the standard of care by Dr. Panchuamuhki, the Court further finds that even if there was a breach of the standard of care, that any conduct by Dr. Panchuamuhki was not a proximate cause of the death of Mr. Scally because from all indications, Mr. Scally's heart made it through the surgery and the initial few hours after surgery fine.

### III. CONCLUSION

**IT IS ORDERED** that judgment shall be entered in counts 2 and 3 of this matter in favor of the defendants, Veterans Administration and the United States of America. The Court **DIRECTS** the Clerk of the Court to enter judgment accordingly.

**IT IS SO ORDERED**

**Dated:  February 7, 2006**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**United States District Judge**